For the foregoing reasons, the judgment of the district court is reversed and remanded.

George ARCE, Plaintiff–Appellant,

v.

Hans G. WALKER, Walter R. Kelly, Albert Hall, Robert Bathrick, Gregory Kadien, Donald LeBaron, John E. Morse, Sgt. D. Richardson, David Odachowski, Ronald L. Bish, D. Pirrami, Kenneth J. Berbary, Robert Reyes, Bryan A. Clark, Daniel Morgan, Robert Davis, And David Bates, Defendants–Appellees.

Docket No. 96–2012.

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1997.

Decided March 18, 1998.

Frederick H. Cohn, New York City (Mark A. Simko, New York City, of counsel), for Appellant.

Martin A. Hotvet, Assistant Attorney General, State of New York (Dennis C. Vacco, Attorney General, Peter H. Schiff, Deputy Solicitor General, Peter G. Crary, Assistant Attorney General, State of New York, Albany, NY, of counsel), for Appellees.

Before: OAKES, MESKILL and CALABRESI, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiff–Appellant George Arce, a state prison inmate, appeals from an order of the United States District Court for the Western District of New York, Larimer, J., denying his motion for summary judgment, granting defendants-appellees prison officials'[1] cross-motion for summary judgment, and dismissing the entire complaint with prejudice. For the reasons set forth below, the district court's grant of summary judgment in favor of the prison officials is affirmed. Because, however, the district court pretermitted several claims in the complaint, we vacate the district court's order dismissing the complaint with prejudice. We remand to the district court for further proceedings on Arce's claims for violation of his constitutional right of access to the courts.

1. Defendants–Appellees are Hans G. Walker, Deputy Superintendent of Attica Correctional Facility (Attica); Walter R. Kelly, Superintendent of Attica; Captain Albert Hall; Lieutenant Robert Bathrick; Sergeants Gregory Kadien, Donald LeBaron, John E. Morse, and D. Richardson; and Correction Officers Robert Davis, Daniel Morgan, Bryan Clark, Kenneth Berbary, Ronald L. Bish, David Odachowski, David Pirrami, David Bates, and Robert Reyes (collectively the "prison officials").

2. See N.Y. Comp.Codes R. & Regs., tit. 7, § 304.1(a)(1) (1961) (inmate is an "automatic

BACKGROUND

In March 1986, Arce was an inmate at Attica Correctional Facility (Attica) serving a prison term of 25 years to life. Arce alleged that several Attica correction officers abused and threatened him during that time. Arce was thereafter transferred out of Attica and he filed a civil rights lawsuit against the Attica correction officers who allegedly had abused him. On December 22, 1986, Arce, then an inmate at Clinton Correctional Facility (Clinton), was transferred back to Attica temporarily to attend court proceedings in that lawsuit.

Arce arrived at Clinton on December 22 at 7:35 p.m. He was classified as a "holdover" inmate and placed in Attica's Special Housing Unit (SHU) on a gallery that housed Involuntary Protective Custody inmates. Inmates are classified as "holdovers" when they are temporarily transferred from one correctional facility to another to attend court proceedings. They are segregated from the general population because prison officials at the receiving facility have insufficient information to assess whether the inmate may be housed safely with the general population. "Holdover" inmates, under then-existing New York prison regulations, were classified as "automatic admission" into the SHU.[2]

On January 5, 1987 at 7:52 a.m., Arce left his cell to attend his court proceedings and returned to Attica at 2:10 p.m. On January 8, 1987, at 7:40 a.m., Arce was put on a bus to return to Clinton. In total, there were 18 days during which, in whole or in part, Arce was housed in the SHU. During that time, prison officials did not allow Arce to attend

admission" into the SHU when he is "properly required to be confined in a special housing unit used as a ... 'detention center' ... (as those terms are defined in the Correction Law)" [hereinafter 7 NYCCRR]; N.Y. Correct. Law § 2(7) (McKinney 1987) (defining a "detention center" as a "correctional facility for the temporary detention ... of persons who are assigned to other correctional facilities for confinement but whose presence is required in court ... that is distant from the institution of confinement"). 7 NYCCRR § 304.1 is presently codified as amended at 7 NYCCRR § 306.1 (1995).

communal religious services and only provided two hours of out-of-cell exercise on one day, December 28, 1996.[3]

On October 11, 1989, Arce filed a *pro se* complaint in the district court. On November 1, 1993, Arce, with the assistance of appointed counsel, filed an amended complaint. The amended complaint, brought pursuant to 42 U.S.C. § 1983, alleged three violations of Arce's constitutional rights during his temporary confinement at Attica:

(1) prison officials violated Arce's liberty interests arising under the Fourteenth Amendment Due Process Clause and state law without due process of law by (a) confining him in administrative segregation for 18 days; (b) depriving him of access to communal religious services; (c) failing to provide him with daily, out-of-cell exercise; and (d) restricting his freedom of movement.

(2) the restrictions on his freedom of movement in conjunction with the deprivation of exercise and access to communal religious services during the 18 day segregation violated Arce's Eighth Amendment rights; and

(3) prison officials violated Arce's constitutional right of access to the courts by (a) destroying his legal documents and (b) by engaging in other abusive acts in retaliation for Arce's pending civil rights lawsuit against several Attica correction officers and officials.[4]

On July 13, 1995, Arce moved for partial summary judgment on the following claims:

(1) that the administrative segregation violated his liberty interests arising under the Fourteenth Amendment Due Process Clause; (2) that the deprivation of daily exercise and harassment during the 18 day segregation violated his liberty interests arising under state law; and (3) the deprivation of exercise violated the Eighth Amendment. On October 2, 1995 the prison officials filed a cross-motion for summary judgment opposing Arce's three claims. The prison officials argued, among other things, that Arce had been offered, but refused, the opportunity to exercise. Moreover, the prison officials contended that, even stipulating to the truth of Arce's allegations, they were entitled to summary judgment. They also argued that because Arce had moved for summary judgment on just a fraction of his myriad claims, the remainder should be deemed abandoned.

On November 27, 1995 the district court denied Arce's motion for summary judgment and granted the prison officials' cross-motion for summary judgment. The district court concluded that Arce's segregation had not deprived him of a liberty interest arising under the Fourteenth Amendment Due Process Clause. The district court also concluded that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Arce failed to demonstrate that his administrative segregation, aggravated by the deprivation of out-of-cell exercise and verbal harassment, amounted to an "atypical and significant hardship" so as to implicate a liberty interest arising under state law.[5]

---

**3.** We amend three misstatements in the district court's opinion. *See Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995). The district court stated that Arce was returned to Clinton on January 9, 1987. *Id.* at 660. Attica prison records, however, indicate that Arce was returned to Clinton on January 8, 1987 and Arce alleged the same in his complaint. The duration of Arce's confinement at Attica was therefore 18 days, not 19. *Id.* at 659. The complaint moreover should be construed to claim a deprivation of exercise for 15 days, not 19. *Id.* at 662. Of Arce's 18 days at Attica, he received exercise on one day and did not receive exercise on two other days due to scheduling conflicts. Arce arrived at Attica on December 22 after the scheduled exercise period had concluded and he departed from Attica on January 8 prior to the exercise period.

**4.** Arce alleged that the retaliatory acts included his confinement in the SHU; abusive "pat-

down" frisks; verbal and physical abuse; gross contamination of his food; and denial of exercise, proper hygienic supplies, proper clothing, and adequate medical treatment.

Arce also argues on appeal that his constitutional right to court access was infringed when prison officials denied him reasonable access to the prison law library. We decline to consider this claim as this allegation appears solely in the *pro se* complaint and was not realleged or incorporated into the amended complaint. *See International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**5.** We clarify an ambiguity in the district court's opinion. On its face, it is unclear whether the district court considered Arce's argument, contained in the cross-motions, that the conditions

Moreover, the court concluded that depriving Arce of out-of-cell exercise during his segregation did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. Without addressing a number of additional claims on the face of the complaint, including claims that Arce's constitutional right of access to the courts had been violated, the district court dismissed the entire complaint with prejudice.

Arce filed a timely notice of appeal on December 28, 1995. On January 29, 1997 we granted Arce's motion for assignment of counsel. We also ordered Arce to address on appeal whether the district court had erred in dismissing Arce's claims for violation of his right of access to the courts.

On appeal, Arce argues that the district court erred in several respects. Arce argues that the district court wrongfully relied on *Sandin*, where the Supreme Court considered an inmate's challenge to the lawfulness of his *disciplinary* segregation, to conclude that Arce's *administrative* segregation did not implicate liberty interests arising under state law. Arce also argues that the district court did not articulate sufficiently the factual predicates for its conclusion that the conditions of Arce's segregation did not affect a state-created liberty interest. Furthermore, Arce argues that the district court erroneously concluded that his 18 day segregation, aggravated by, among other things, a deprivation of daily exercise and access to communal religious services, did not impose an "atypical and significant hardship" so as to implicate a state-created liberty interest. Arce finally argues that the complaint was improperly dismissed with prejudice because the district court failed to review the claims alleging the violation of his constitutional right of access to the courts.

We discuss Arce's arguments below. As background to our discussion, we briefly ex-

amine the established sources of liberty interests for prison inmates.

## DISCUSSION

 To articulate a claim under 42 U.S.C. § 1983 alleging the violation of a liberty interest without procedural due process, an inmate must first establish that he enjoyed a protected liberty interest. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). Inmates' liberty interests are typically derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations. *Id.* With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the "the most basic liberty interests in prisoners." *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) ("Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen."). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates, *Sandin*, 515 U.S. at 478, 115 S.Ct. at 2297, if those changes are " 'within the normal limits or range of custody which the conviction has authorized the State to impose,' " *id.* (quoting *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in '. . .' an unexpected manner." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300; *see id.* at 479 n. 4, 115 S.Ct. at 2297 n. 4 (observing that proscribed conditions of confinement must be "qualitatively different from the

of his administrative segregation violated his liberty interests arising under *state law*. The district court, at the outset of its discussion, stated that Arce, on summary judgment, had argued solely that his liberty interests arising under the *Due Process Clause* had been violated. *See Arce,* 907 F.Supp. at 661 ("Arce does not assert that the liberty interest arose as the result of a state law or regulation prohibiting extended confinement without a hearing, but rather was implicat-

ed by the Due Process [C]lause alone."). Despite this misreading of Arce's arguments, it appears, and both parties proceed as if, the district court nevertheless reviewed Arce's arguments under *state law. See Arce,* 907 F.Supp. at 662 n. 3. We therefore read the district court's order as dismissing Arce's argument that the conditions of his segregation violated liberty interests arising under state law.

punishment characteristically suffered by a person convicted of crime, and [have] stigmatizing consequences." (citation and internal quotation marks omitted)); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (holding that "involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual"); *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (holding that inmate has a liberty interest under the Due Process Clause to refuse the involuntary administration of psychotropic drugs).

■ Aside from the Fourteenth Amendment Due Process Clause, state statutes and regulations may also confer liberty interests on prisoners. *See Kentucky Dep't of Corrections,* 490 U.S. at 460, 109 S.Ct. at 1908. The Supreme Court in *Sandin* recently modified the analysis under which federal courts determine whether state law confers a liberty interest on inmates. Traditionally, federal courts, following *Hewitt,* had parsed the language of state statutes or regulations to determine whether the language was of an "'unmistakably mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates'" that limited the discretion of prison officers. *See Sandin,* 515 U.S. at 480, 115 S.Ct. at 2298 (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871). This "search for a negative implication from mandatory language in prison regulations," *Sandin,* 515 U.S. at 483, 115 S.Ct. at 2300, improperly entangled the federal courts in the daily administration of prisons and "create[d] disincentives for States to codify prison management procedures," *id.* at 482, 115 S.Ct. at 2299. Therefore, the *Sandin* Court redirected our inquiry to the "nature of the [liberty] interest ... allegedly created by the State[s]" to ensure that it was one of "real substance." *Id.* at 480, 115 S.Ct. at 2298 (citations and internal quotation marks omitted). A prison inmate is now required to meet a two-part test to establish the existence of a liberty interest arising under a state statute or regulation: the inmate must establish that his confinement or restraint (1) creates an "atypical and significant hardship ... in relation to the ordinary incidents of prison life," *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300, and (2) that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

■ The standard articulated in *Sandin* applies retroactively to govern our review of Arce's claims. *See Harper* v. *Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (holding that "[w]hen [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). We review *de novo* the district court's grant of summary judgment, *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996), and construe all "inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation and internal quotation marks omitted). With the foregoing principles in mind, we now turn to Arce's arguments on appeal.

## A. Sandin's Scope

■ Arce challenges the district court's conclusion under *Sandin* that he failed to demonstrate that the conditions of his administrative segregation implicated a state-created liberty interest. *Arce,* 907 F.Supp. at 662 n. 3. Arce argues that *Sandin* is not the governing analysis; he contends that *Sandin* applies only to determine whether claims contesting the conditions of *punitive* segregation implicate state-created liberty interests. In effect, Arce argues that because he was confined for *administrative* purposes, the pre-*Sandin, Hewitt* analysis is the governing standard. Under the *Hewitt* analysis, Arce argues that the language of former New York State prison regulations created a liberty interest in out-of-cell exercise. *See* 7

NYCCRR § 301.5 ("Except as otherwise provided in this section, every inmate shall be permitted to exercise outside of his cell for at least one hour each day and, where weather permits, such exercise *shall* be permitted out-of-doors." (emphasis added)).[6]

Arce's argument is meritless. To be sure, the prison condition at issue in *Sandin* was an inmate's challenge to his confinement in disciplinary segregation. Nothing in *Sandin*, however, indicates that the new standard it articulated to determine whether state law confers a liberty interest on inmates was to be limited to prisoner challenges against disciplinary restraints. The *Sandin* Court decisively "abandon[ed] ... *Hewitt*'s methodology," *Sandin*, 515 U.S. at 483 n. 5, 115 S.Ct. at 2300 n. 5, that had drawn a rigid distinction between statutes that did, or did not, read in mandatory terms. The Court "return[ed] to the due process principles [that] were correctly established and applied in *Wolff* and *Meachum*," *id.* at 483, 115 S.Ct. at 2300, under which inmates were required to demonstrate that their alleged liberty interest was one of " 'real substance,' " *id.* at 478, 115 S.Ct. at 2297 (citation omitted). *Sandin* dispensed with mechanical distinctions such as the one Arce offers and instead established an analysis under which the degree and duration of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest. Notably the *Hewitt* analysis, decisively rejected by *Sandin*, had evolved against inmate challenges to both disciplinary and administrative restraints. *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (loss of good time credit for misconduct); *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (administrative segregation). Therefore, in applying the *Sandin* analysis, we will not impose a novel distinction between prison restraints imposed for disciplinary and administrative purposes.

Several considerations reinforce our conclusion. Had the Court, as Arce argues, intended to retain the traditional *Hewitt* analysis for challenges to nondisciplinary segregation, it seems it would have expressly said so. Notably, the Court did expressly limit the breadth of *Sandin*'s holding but made no mention of its purported limitation to inmate challenges against prison disciplinary measures. *See Sandin*, 515 U.S. at 487 n. 11, 115 S.Ct. at 2302 n. 11 (confirming that "[p]risoners ... retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause"); *see Cody*, 895 F.Supp. at 441 ("[I]t seems ... that if the Supreme Court intended to limit the impact of *Sandin* to disciplinary cases, it could easily have done so, but it did not."); *cf. Rodriguez v. Phillips*, 66 F.3d 470, 480 (2d Cir. 1995) ("*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from *administrative* segregation." (emphasis added)). In light of *Sandin*'s broad language and forceful reasoning, we affirm the district court's use of the *Sandin* analysis to determine that Arce's administrative segregation did not implicate a state-created liberty interest.

### B. The Articulation of Factual Predicates

█ Arce argues that the district court did not adequately examine the specific circumstances of his administrative segregation before concluding that Arce had failed to demonstrate that the conditions of his confinement imposed an "atypical and significant hardship." He argues that the district court categorically rejected his due process challenge to the conditions of his segregation, relying solely on the finding that Arce's segregation was of shorter duration than that at issue in *Sandin*. *See Sandin*, 515 U.S. at 486, 115 S.Ct. at 2301 (30 day disciplinary segregation). Arce contends the district court failed to consider other relevant circumstances bearing on the hardship of his segregation, such as the deprivation of exercise and harassment.

---

**6.** The provision governing exercise for inmates in the SHU is presently codified at 7 NYCCRR § 304.3.

We reject Arce's argument. Arce's argument relies on two recent decisions in which we held that a district court is required to "identify with specificity the facts upon which its conclusion is based" in determining whether a prison restraint constitutes an "atypical and significant hardship" so as to implicate a liberty interest under state statute or regulation. *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *see Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) (district court must examine the "circumstances of a confinement to determine whether that confinement affected a liberty interest"). We concluded in *Brooks* that the district court failed to "consider the length of the confinement in determining whether it imposed an atypical and significant hardship ... [or] make any findings about the restrictiveness of [the inmate's confinement] or about the prevailing conditions in administrative confinement or in the prison at large." *Brooks,* 112 F.3d at 48; *Miller,* 111 F.3d at 8 (rejecting district court's conclusion that segregated confinement, as a matter of law, does not create an "atypical and significant hardship").

The district court here sufficiently examined the circumstances of Arce's segregation and articulated the facts on which its conclusion was predicated. The district court considered the duration of Arce's confinement without exercise, observing that it was "[12] days shorter than the prisoner's in *Sandin,*" *Arce,* 907 F.Supp. at 662 n. 3, and that "[e]xercise deprivation for several days is surely not of such moment as to constitute a Due Process deprivation." *Id.* at 662. The district court also considered the alleged deprivations that aggravated the hardship of Arce's segregation, concluding that the "combined effects of the [18] day segregation plus exercise deprivation and verbal harassment" did not amount to an atypical and significant hardship. *Id.* at 662 n. 3. We conclude that, under *Brooks* and *Miller,* the district court sufficiently articulated the factual predicates for its determination that the conditions of

Arce's segregation did not implicate a state-created liberty interest.

### C. *Deprivation of Liberty Interests Under State Law*

■ Arce also challenges the merits of the district court's conclusion that his administrative segregation did not constitute an "atypical and significant hardship" so as to affect a state-created liberty interest. Arce seeks to distinguish his segregation from that at issue in *Sandin* by arguing that, among other abuses, he also was deprived of exercise and access to communal religious services.[7] Arce argues that the combined effects of these deprivations during his 18 day segregation caused him to suffer an "atypical and significant" hardship.

■ We disagree. As we suggested in *Brooks,* whether the conditions of a segregation amount to an "atypical and significant hardship" turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation. *See Brooks,* 112 F.3d at 48–49; *see also Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). Here, Arce is serving a prison term of 25 years to life. The conditions of Arce's administrative segregation were certainly more restrictive that those in the general population. In the general population, among other things, Arce would have received at least three hours of out-of-cell exercise and would have been allowed to attend church services and communal meals. In the SHU, Arce was entitled to only one hour of exercise per day and could not attend communal religious services or communal meals. Yet, the deprivations Arce endured were not more onerous that those considered, and constitutionally sanctioned in *Sandin. See Sandin,* 515 U.S. at 494, 115 S.Ct. at 2305 (Breyer, *J.,* dissenting). In *Sandin,* although inmates in the general population were permitted to leave their cells for most of the day to take classes, work, and mingle with others, the inmates in disciplin-

---

**7.** Arce argues that a host of additional abuses aggravated the hardship of his administrative segregation including verbal harassment, food tampering and destruction of legal documents. We decline to consider these abuses because they were alleged in the complaint exclusively with respect to Arce's court access claim and were not incorporated or realleged in his due process claim. *See* 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1326, at 759 (2d ed.1990).

ary segregation were isolated from other inmates and only permitted approximately 50 minutes a day to exercise and shower. The Court nevertheless held that "[t]he regime to which [the inmate] was subjected ... was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 487, 115 S.Ct. at 2302. Even assuming that the additional deprivations of communal religious services and out-of-cell exercise for 15 days caused the level of Arce's hardship to exceed the hardship at issue in *Sandin,* any difference is significantly offset by the relative brevity of Arce's segregation which was 12 days shorter than the 30 day segregation in *Sandin. See Sandin,* 515 U.S. at 486, 115 S.Ct. at 2301; *see also Frazier,* 81 F.3d at 317 (holding that 12 days of pre-hearing confinement in the SHU did not implicate a state-created liberty interest). Moreover, the 15 day duration without exercise does not represent a continuous confinement without out-of-cell privileges; Arce received exercise on December 28 and attended court on January 5 within that time span. He also left his cell regularly to shower and to use the telephone, mitigating the hardship. *See Morissette v. Ramos,* 1996 WL 521170, at *4 (N.D.Ill. Sept. 9, 1996) (confinement with denial of outdoor exercise for 63 days did not affect a liberty interest under state law because prisoner could exercise in his cell, on trips to the shower and telephone, and because prisoners in the general population were also deprived of exercise when the prison was put on lockdown status).[8] Sergeant LeBaron testified in his deposition that the conditions for Arce in involuntary protective custody were similar to those in administrative protective custody and disciplinary segregation. *See Sandin,* 515 U.S. at 486, 115 S.Ct. at 2301 (inmate's confinement "did not exceed similar, but totally discretionary, confinement in either duration or degree").

In sum, we affirm the district court's conclusion that Arce's confinement did not "present a dramatic departure from the basic conditions of [Arce's] ... sentence." *Sandin,* 515 U.S. at 485, 115 S.Ct. at 2301; *Griffin v. Vaughn,* 112 F.3d 703, 708 (3d Cir.1997) (fifteen months of administrative segregation not atypical when "inmates in a myriad of circumstances [would] find themselves exposed to the [same] conditions to which [the inmate] was subjected"); *Mackey v. Dyke,* 111 F.3d 460, 463 (6th Cir.1997) (holding that 117 days in administrative segregation due to lack of bed space did not implicate a state-created liberty interest), *cert. denied,* —— U.S. ——, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997); *see Cody,* 895 F.Supp. at 436 and 441 (periodic deprivation of outdoor exercise over the span of several months did not implicate state-created liberty interest); *Gill v. Pact Organization,* 1997 WL 539948, at *10 (S.D.N.Y. Aug. 28, 1997) (administrative segregation with temporary denial of exercise privileges for 26 days was not an atypical or significant hardship); *Farmer v. Hawk,* 1996 WL 525321, at *6 (D.D.C. Sept. 5, 1996) (deprivation of access to communal religious services, among others, did not implicate a state-created liberty interest).

### D. Arce's Remaining Claims

■ Arce does not appeal the district court's grant of summary judgment in favor of the prison officials on his claims that the segregation violated a liberty interest arising under the Fourteenth Amendment Due Process Clause and that the deprivation of daily exercise violated the Eighth Amendment. Nor does Arce appeal the dismissal of his claims alleging that (1) the deprivation of his "freedom of movement" violated his Eighth Amendment rights and his right to procedural due process under the Fourteenth Amendment; (2) the deprivation of communal religious services and exercise violated his liberty interests arising under the Fourteenth Amendment Due Process Clause; and (3) the administrative segregation and the deprivation of communal religious services violated the Eighth Amendment. We therefore deem these claims abandoned.

■ We reinstate Arce's claims for violation of his constitutional right of access to the courts and remand to the district court

---

8. We, of course, express no views on whether a prisoner who has been denied all out-of-cell exercise for a longer period of time might have suffered an "atypical and significant hardship."

for further proceedings on these claims. We reject the prison officials' argument that, by virtue of an isolated reference in the "Preliminary Statement" portion of their brief supporting their cross-motion for summary judgment, they are entitled to summary judgment on these claims. Their brief stated that "[i]nasmuch as [Arce] has not moved for Summary Judgment on any other claim or briefed them, any other claims should be deemed abandoned and judgment entered in [the prison officials'] favor." The prison officials' argument is meritless; Arce, by moving for summary judgment on only a portion of his myriad claims, moved for partial summary judgment and did not thereby abandon his claims for violation of his right to access the courts. *See* Fed.R.Civ.P. 56(d). Nor are the prison officials entitled to summary judgment on Arce's claims by virtue of Arce's failure to oppose this single, isolated statement in the prison officials' cross-motion for summary judgment. The prison officials have not met their burden on summary judgment to demonstrate that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on Arce's court access claims. *See F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (movant for summary judgment bears the initial burden of production).

## CONCLUSION

The grant of summary judgment in favor of the prison officials is affirmed. We vacate the district court's order dismissing Arce's complaint with prejudice. We remand for further proceedings on Arce's claims for violation of his constitutional right of access to the courts.