**Theadore BLACK, Plaintiff,**

v.

**Donald SELSKY and Lt. D. Ryan, Defendants.**

**No. 93–CV–6276L.**

United States District Court, W.D. New York.

July 24, 1998.

---

Theadore Black, Attica Correctional Facility, Attica, NY, pro se.

Carlos Rodriguez, Sean Edward Gleason, Rene Davison, Office of the New York State Atty. Gen., Rochester, NY, for Defendants.

*DECISION AND ORDER*

LARIMER, Chief Judge.

## BACKGROUND

Plaintiff, Theadore Black ("Black"), a prisoner in the New York State Department of Correctional Services, brought this civil action, *pro se*, pursuant to 42 U.S.C. § 1983. In his original complaint, Black named only Thomas A. Coughlin, III, former Commissioner of DOCS, as a defendant. The complaint was dismissed by this court and leave to amend the complaint was denied as futile. On appeal, the Second Circuit affirmed this court's dismissal of Coughlin but vacated and remanded that part of the decision denying Black's motion to amend his complaint. *Black v. Coughlin,* 76 F.3d 72 (2d Cir.1996). Subsequently, on April 17, 1996, Black filed his amended complaint with this court in which he alleges that defendant Correction Lieutenant D. Ryan ("Ryan") and defendant Donald Selsky ("Selsky"), Director of the Special Housing and Inmate Disciplinary Program, violated his Fourteenth Amendment due process rights while he was incarcerated at Southport Correctional Facility ("Southport").

Following Black's filing of his amended complaint, the parties proceeded with discovery and the matter is now pending before me on the parties' cross-motions for summary judgment. For the following reasons, Black's motion is denied, defendants' motion is granted and Black's complaint is dismissed in its entirety.

## FACTS

On or about March 14, 1990, while incarcerated at Southport, Black was served with an inmate disciplinary report charging him with the possession and concealment of several weapons in his cell. The charge stemmed from a search of Black's cell conducted on March 13, 1990 by correction officer Gridley ("Gridley"). During the course of the search, Gridley found several shanks on the inside groove of a locker door located in Black's cell.

On March 19, 1990, a Tier III disciplinary hearing relating to the charge was commenced before hearing officer Ryan. The hearing was continued until March 28, 1990, in order to receive Gridley's testimony. The hearing was concluded on March 28, 1990. Following the hearing, Ryan found Black guilty of the charges and sentenced him to 180 days in the Special Housing Unit ("SHU"), along with a loss of package, commissary and telephone privileges and loss of 180 days good-time credits.

Black filed an appeal of Ryan's determination to Selsky's office. On May 29, 1990, Selsky affirmed Ryan's hearing determination. Black then commenced an Article 78 proceeding in state court. Prior to the resolution of the Article 78 proceeding, Selsky administratively reversed Ryan's determination on the ground that Selsky had inadvertently failed to timely determine Black's initial appeal. By that time, however, Black had already served 180 days in SHU [1].

## DISCUSSION

Black alleges that he was deprived of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution. Specifically, Black complains that his due process rights were violated during the course of his disciplinary hearing because: (1) Ryan was biased against Black; (2) the disciplinary hearing was not completed in a timely fashion and (3) there was insufficient proof to support Ryan's determination. Further, Black claims that Selsky violated his due process rights by initially affirming Ryan's determination. According to Black, Selsky's eventual reversal of Ryan's determination is "proof" that Selsky knew that the hearing violated Black's due process rights.

1. Defendants referenced the fact that plaintiff was serving time in SHU for other disciplinary infractions but it appears that each sentence was imposed consecutively. Therefore, it appears that plaintiff's stay in SHU was increased by the 180 day sentence he served on the instant infraction and no argument can be made, on the evidence before me, that plaintiff would have been in SHU anyway, serving other concurrent sentences.

## LIBERTY INTEREST

■ In order to reach the merits of Black's due process claim, the Court must first conclude that Black had a protected liberty interest in remaining free from the penalties imposed. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "Inmates' liberty interests are typically derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations." *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The circumstances under which a prisoner's liberty interest arises directly under the Due Process Clause are narrow. Generally, for a liberty interest to arise directly under the Due Process Clause, the proscribed conditions of confinement must be "qualitatively different from the punishment characteristically suffered by a person convicted of crime and (have) stigmatizing consequences." *Sandin v. Conner,* 515 U.S. 472, 479, n. 4, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)(internal quotation marks and citations omitted). *See, e.g., Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)(involuntary commitment to mental hospital implicated liberty interest directly under Due Process Clause); *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)(involuntary administration of psychotropic drugs implicated liberty interest directly under Due Process Clause).

■ In the present case, Black's conditions of confinement in SHU were not so different from the punishment characteristically suffered by a person convicted of a crime so as to implicate a liberty interest directly under the Due Process Clause. That, however, does not end the inquiry. Liberty interests may also arise from state statutes and regulations. In order to establish a liberty interest arising under a state statute or regulation, "the inmate must establish that his confinement or restraint (1) creates an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life' . . . and (2) that 'the state has granted its inmates, by regulation or by stat-

ute, a protected liberty interest in remaining free from that confinement or restraint.' " *Arce,* 139 F.3d at 334 (internal quotation marks and citations omitted).

In *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293 the Court held that neither Hawaii state regulations nor the Due Process clause created a liberty interest for a prisoner in avoiding thirty days' disciplinary confinement in SHU, even though confinement meant that the prisoner "had to spend his entire time alone in his cell (with the exception of 50 *minutes* each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains)." *Id.* 515 U.S. at 493 (Breyer J., dissenting)(emphasis in original). In determining that the inmate's thirty day confinement did not implicate a liberty interest, the *Sandin* court considered that: (1) disciplinary segregation, with certain insignificant exceptions, mirrored the conditions of those inmates in administrative segregation and protective custody; (2) the confinement did not exceed similar, but totally discretionary confinement in either duration or degree; (3) the conditions at the prison where the inmate was housed involved significant amounts of "lockdown time" even for inmates in general population (anywhere between 12 and 16 hours a day); and (4) the state expunged, in part, the inmate's disciplinary record nine months after he served time in segregation, removing the possibility that the charge could have affected his chances of being paroled. *Id.* 515 U.S. at 486, 115 S.Ct. 2293. Thus, the *Sandin* court found that, under the circumstances, "[t]he regime to which [the inmate] was subjected was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* 515 U.S. at 487, 115 S.Ct. 2293.

■ As the Court did in *Sandin,* I am required to examine the specific circumstances of the punishment in the case before me in order to determine whether the punishment imposed "atypical and significant hardship" on Black so as to implicate a liberty interest. *See Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Brooks v. DiFasi,* 112 F.3d

46, 49 (2d Cir.1997). As part of this examination, I must consider the duration of the confinement, as well as the restrictiveness of the conditions imposed in relation to the prevailing conditions in both non-punitive segregation and in the prison at large. *Brooks,* 112 F.3d at 47–49.

Here, Black alleges that due to defendants' unconstitutional conduct, he was denied certain privileges, deprived of good-time credits, and detained in SHU for 180 days. , The "punishments" imposed in this case are virtually indistinguishable from those at issue in *Sandin,* with the exception of the duration of the confinement. "In *Sandin,* although inmates in the general population were permitted to leave their cells for most of the day to take classes, work, and mingle with others, the inmates in disciplinary segregation were isolated from other inmates and only permitted approximately 50 minutes a day to exercise and shower." *Arce,* 139 F.3d at 337. Despite the differences in the conditions of confinement between prisoners in general population and those in SHU, the *Sandin* court still found that no liberty interest was implicated. *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293.

In New York, inmates may be placed in SHU as a result of a disciplinary hearing, 7 NYCRR § 301.2(a), for administrative reasons, *id.* §§ 301.3, 301.4, for protective custody, *id.* § 301.5, for keeplock confinement, *id.* § 301.6, or for any other reason, *id.* § 301.7. All inmates placed in SHU experience essentially the same basic conditions of confinement.[2] It is undisputed that all SHU inmates are allowed two showers per week, *id.* § 304.5(a), and one hour of outdoor exercise per day, *id.* § 304.3; are entitled to unlimited legal visits and one non-legal visit per week, *id.* § 302.2(j)(1)(i); are allowed to receive and send privileged or personal correspondence, *id.* § 302.2(i); have access to counseling services on a daily basis, *id.* § 304.10; are given an opportunity to participate in a cell study program, to the extent possible based on overall behavioral adjustment, *id.* § 304.11; are permitted visits from counselors, teachers, or other appropriate staff members, *id.;* have daily access to sick call; *id.* § 304.4(c) and; are permitted to receive books and periodicals from both the law library, *id.* § 304.7, and the general library, *id.* § 304.12. Therefore, the conditions of disciplinary confinement, with insignificant exceptions, essentially mirror those conditions imposed on inmates housed in SHU for administrative or other reasons. *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293.

Further, while Black's confinement to SHU was more restrictive than confinement in general population, the restrictions do not appear to be any greater than the restrictions imposed on the inmate in *Sandin.* In *Sandin,* general population inmates were permitted to leave their cells for various activities for eight hours each day, while an inmate in SHU was isolated from all other inmates and was only permitted outside his cell for 50 minutes each day for exercise and a shower. Similarly, SHU inmates in New York State are confined to their cells for approximately 23 hours each day with one hour of outdoor exercise daily, 7 NYCRR § 304.3, as well as for two showers weekly, *id.* § 304.5(a), while general population inmates are confined to their cells approximately twelve hours a day during the week and possibly more on the weekends.[3] See Affidavit of Anthony Annucci ("Annucci Aff.") ¶¶ 17–18.

Thus, given the similarity in the conditions of confinement faced by Black to those conditions faced by the inmate in *Sandin,* I find that the conditions faced by Black while in SHU, in and of themselves, do not give rise to a liberty interest.

■ Furthermore, although I recognize that Black's confinement to SHU was significantly longer than that which the inmate faced in *Sandin,* I do not find that the difference in the duration of the confinement, in

---

2. Given their unique status, protective custody inmates, however, receive certain additional privileges. 7 NYCRR § 330.4.

3. General population inmates usually spend their out-of-cell time at programs or at meals. While the inmates in SHU are unable to attend programs and meals, they do have an opportunity to participate in a cell study program and are provided with all of their meals in the SHU setting.

this case, significantly altered the nature of the confinement so as to give rise to a liberty interest.

Black is serving a sentence of imprisonment of a minimum of 13 years and a maximum of 36 years for a robbery conviction. He spent 180 days in SHU. Lengthy disciplinary confinement is prevalent in New York State prisons and is a normal element of New York's prison regime. *See* Annucci Aff. ¶ 24; *see also Warren v. Irvin,* 985 F.Supp. 350, 354 (W.D.N.Y.1997)(discussing prevalence of disciplinary confinement in New York State prisons). Black himself was no stranger to SHU. He had been confined there repeatedly for disciplinary infractions and was serving several consecutive sentences for those violations.

Further, courts in this Circuit have ruled that lengthy periods of disciplinary confinement do not impose "atypical and significant hardship" within the meaning of *Sandin. See e.g., Brooks v. DiFasi,* 1997 WL 436750, *4 (W.D.N.Y. July 30, 1997)(on remand)(no liberty interest in avoiding 180 days confinement); *Warren,* 985 F.Supp. at 354–356(no liberty interest in avoiding 161 days confinement); *Trice v. Clark,* 1996 WL 257578, at *3 (S.D.N.Y.) (no liberty interest in avoiding 150 days confinement), *aff'd on other grounds,* 131 F.3d 132, 1997 WL 738116 (2d Cir.1997)(unpublished decision). Accordingly, I find that Black's confinement in SHU for 180 days does not present the type of atypical and significant deprivation in which a state may conceivably create a liberty interest. *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293.

Black has not challenged any of the proffered characteristics of SHU and simply has not alleged any facts that would support a finding that the conditions in SHU were dramatically different from the basic conditions of his confinement. *See Sims v. Artuz,* 1997 WL 527882, at * 10 (S.D.N.Y. Aug.25, 1997). In short, the regime to which Black was subjected as a result of his disciplinary hearings—both in duration and degree of restriction—was within the range of confinement to be normally expected for one serving a 13 to 36 year sentence of imprisonment. *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293.

Part of Black's punishment also included a temporary loss of various privileges such as telephone, package, and commissary privileges. These "punishments" do not "represent the type of deprivation which could reasonably be viewed as imposing atypical and significant hardship on an inmate." *Id.* 985 F.Supp. at 353 (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) and *Brooks,* 1997 WL 436750, at *3). As such, Black did not have a liberty interest in avoiding the loss of these privileges.

Likewise, under the particular circumstances of this case, Black's loss of good time credit does not implicate a liberty interest. Black's disciplinary hearing was eventually administratively reversed and his record expunged. There is no allegation or any evidence that the temporary loss of good time credits that occurred after the disciplinary hearing but prior to the administrative reversal actually affected the length of Black's confinement. "It is well settled that where, as here, an inmate's good-time credits are completely restored after a successful administrative appeal and before their loss could have any impact on the duration of the inmate's sentence, no liberty interest is implicated." *Warren,* 985 F.Supp. at 354 (citing *Beaman v. Coombe,* 1997 WL 538833, at *4 n. 3 (S.D.N.Y. Aug.29, 1997)); *Cespedes v. Coughlin,* 956 F.Supp. 454, 472–75 (S.D.N.Y.), *vacated on reconsideration, on other grounds,* 969 F.Supp. 254 (S.D.N.Y. 1997).

For the foregoing reasons, Black's SHU confinement does not give rise to a liberty interest sufficient to support a due process claim. Accordingly, his complaint must be dismissed.

## DUE PROCESS PROTECTIONS

■ Even assuming, however, that Black's confinement to SHU did give rise to a protected liberty interest, his complaint must still be dismissed as Black received all of the process that he was due during the course of his disciplinary hearing. Whenever a protected liberty interest is involved, inmates in prison disciplinary hearings are entitled to certain due process protections. These pro-

tections include: (1) advance written notice of the claimed violation; (2) a written statement of the hearing officer as to the evidence relied upon and the reasons for the disciplinary action taken; and (3) an opportunity for the inmate to call witnesses and present evidence in his defense as long as that process would not jeopardize institutional safety or correctional goals. *Wolff,* 418 U.S. at 563–67, 94 S.Ct. 2963. Furthermore, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer," *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996), and there must be "some evidence to support the findings made in the disciplinary hearing." *Superintendent v. Hill,* 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir. 1992).

There is no dispute, in the present case, that Black was given advance written notice of the charges, that he was not prevented from calling witnesses or presenting a defense, and that the hearing officer, Ryan, provided a written statement as to the evidence he relied upon and the reasons for the action taken. Black's due process claim relates to his allegations that (1) Ryan was biased against him, (2) the hearing was untimely and (3) there was insufficient evidence for a guilty finding.

■ Black's bias claim against Ryan stems from Ryan's previous involvement in denying Black a "time cut" from a SHU sentence that Black was serving as a result of charges unrelated to the instant action. Although an inmate does have the right to an impartial hearing officer, the degree of impartiality required of prison hearing officers does not rise to the level required of judges generally. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) (citing *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)); *Allen,* 100 F.3d at 259. Rather, the standard set forth in *Wolff,* 418 U.S. at 571, 94 S.Ct. 2963 requires that the hearing officer not be so insufficiently impartial as to present a "hazard of arbitrary decisionmaking." Here there is nothing in the record to indicate that Ryan prejudged the evidence at Black's hearing. Black's allegation that Ryan's "time cut" denial in an unrelated mat-

ter demonstrates Ryan bias against him is meritless. Black has pointed to nothing whatsoever relating to Ryan's handling of the disciplinary hearing at issue here that would indicate that Ryan was biased against Black. Further, I have reviewed the transcript of the disciplinary hearing and I find no evidence there of Ryan's alleged bias.

■ Black also claims that the disciplinary hearing violated his due process rights because the hearing was held in violation of the "fourteen day rule" which provides:

"The disciplinary hearing ... must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the Commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons..." 7 NYCRR § 251–5.1(b).

Black's argument is meritless. The disciplinary ticket was written on March 13, 1990. The hearing was commenced on March 19, 1990, six days later. During the hearing, Ryan asked Black if he wanted Gridley as a witness. Initially, Black did not respond to Ryan's question. However, Black ultimately consented to an adjournment of the hearing in order to procure Gridley's testimony:

D. Ryan: Well what were going to do Blacks is that Ill adjourn your hearing until I can get Mr. Gridley to testify, and we'll find out what's going on. All right?

Blacks: Okay.

(Defendant's Exhibit A—Tier III Hearing Transcript, March 19, 1990).

Thus, the hearing was temporarily adjourned to March 27, 1990, which was the fourteenth day after issuance of the disciplinary infraction.

It is undisputed that on March 27, 1990, Southport was "shut down" and all inmates were confined to their cells in order to allow prison officials to conduct a general frisk of the entire facility. Because Black would not have been able to attend a hearing due to the "shut down," on March 27, 1990, Ryan requested and was granted an extension of one day, until March 28, to hold the hearing. The

hearing was re-commenced and was concluded on March 28, 1990. At the hearing, Ryan asked Black if he received a copy of the extension and if he was aware of the reasons behind it, to which Black responded affirmatively.

I find that the timing of Black's hearing was consistent with the fourteen day rule. The original hearing was commenced six days after the writing of the misbehavior report. An extension was requested and granted on the fourteenth day after the misbehavior report was written, not on the fifteenth day as Black suggests. Further, Black received a copy of the extension and admitted that he knew the reasons behind the extension. Black also consented to the initial adjournment of the hearing in order to receive Gridley's testimony. Thus, Black's allegation that his due process rights were violated as a result of Ryan's violation of the fourteen day rule is meritless.

Finally, Black argues that Ryan's determination was a violation of his due process rights because there was insufficient evidence to support a guilty finding. The amount of evidence needed in the prison disciplinary hearing context to satisfy due process concerns is minimal. "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the [hearing officer]." *Hill,* 472 U.S. at 457, 105 S.Ct. 2768. Rather, in determining matters of sufficiency, the court's function is to determine "whether there is any evidence in the record that could support the conclusion reached" by the hearing officer. *Id.* at 472 U.S. 455–456, 105 S.Ct. 2768.

In the present case, I find that there was sufficient evidence to support Ryan's determination, i.e., the written report and verbal testimony of Gridley stating that while searching Black's cell, he found several weapons. In the context of a prison disciplinary hearing, the evidence was sufficient for due process purposes.

Thus, I find that even if Black did have a liberty interest in avoiding 180 days in SHU, Ryan's conduct during and after the disciplinary hearing comported with all due process requirements. Further, because Black's

claims against Ryan are meritless and Selsky's alleged wrongdoing was based on his affirming Ryan's determination, there is no basis for the claims against Selsky either.

## CONCLUSION

Black's motion for summary judgment is denied. Defendants' motion for summary judgment is granted. The amended complaint is dismissed in its entirety.

IT IS SO ORDERED.