Bashir HAMEED, a/k/a James
York, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner; Louis Mann, Superintendent; Donald Selsky, Director of Special Housing and Inmate Disciplinary Programs; and John Patterson, Hearing Officer, Defendants.

No. 90–CV–590 (LEK/GLS).

United States District Court,
N.D. New York.

Feb. 2, 1999.

---

Bashir Hameed, pro se.[1]

Eliot L. Spitzer, Attorney General of the State of New York, Albany, NY, for defendants, Joseph Amicone, Asst. Attorney General, of counsel.

Dennis C. Vacco, Attorney General of the State of New York, Albany, New York, for defendants, Joseph Amicone, Asst. Attorney General, of counsel.

## DECISION AND ORDER

KAHN, District Judge.

Plaintiff Bashir Hameed ("Hameed") brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated his First, Eighth and Fourteenth Amendment rights. Currently pending is Defendants' motion for summary judgment. The matter comes before the Court following a Report–Recommendation filed on October 28, 1998 by the Honorable Gary L. Sharpe, Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York.

Plaintiff's claims arise out of his confinement in the Special Housing Unit ("SHU") at Shawangunk Facility. Plaintiff was initially sentenced to disciplinary confinement beginning October 27, 1988 after he was found to have played a leadership role in an incident involving the disobedience of several other inmates. Plaintiff's term of disciplinary confinement lasted from October 27, 1988 to October 26, 1989. However, after this term was over, Plaintiff was kept in confinement pursuant to an "administrative segregation recommendation" signed by Defendant Louis Mann, alleging, *inter alia,* that Plaintiff's presence in the general population would pose a threat to the safety and security of the facility. Plaintiff was given a hearing on the recommendation, at which several witnesses testified. The hearing officer, defendant John Patterson ("Patterson") ultimately determined that Plaintiff would remain in administrative segregation. Thereafter, Plaintiff's confinement was subject to periodic reviews. On each occasion, the recommendation was a continuation of the confinement. Clerkin Aff.Exh. J. Plaintiff was not released from administrative segregation until June of 1991 when he was transferred to another prison.

Plaintiff commenced this action alleging eight federal claims. First, he alleged that the Defendants violated his First and Fourteenth Amendment rights by confining him for his political and religious beliefs and for statements he made to other inmates. Second, he alleged that the Defendants violated his Fourteenth Amendment rights by subjecting him to indefinite segregation. Third, he alleged that Defendants Patterson and Defendant Donald Selsky ("Selsky") violated his Fourteenth Amendment rights by accepting the recommendation to keep him confined in administrative segregation after his term of disciplinary confinement was over. Fourth, he alleged that Defendants Louis Mann ("Mann"), Donald Selsky ("Selsky") and Thomas A. Coughlin, III ("Coughlin") violated his Fourteenth Amendment rights by failing to establish meaningful procedures for the periodic review of an administrative segregation. Fifth, Plaintiff alleged that Defendants Selsky and Coughlin violated Plaintiff's First and Fourteenth Amendment rights by establishing and maintaining a policy of limiting Plaintiff's visits in confinement. Sixth, he alleged that Defendants Selsky and Coughlin violated Plaintiff's Fourteenth Amendment right to due process and equal protection by establishing and maintaining a policy which treated Plaintiff and other inmates in administrative segregation differently than other inmates confined in SHU for non-punitive reasons. Seventh, he alleged that Defendants

1. It is noted that Plaintiff also requests injunctive relief, specifically that he be released from administrative segregation. Since he has already been released, this relief is clearly moot.

Mann, Selsky and Coughlin violated Plaintiff's rights under the Eighth and Fourteenth Amendments by deliberate indifference to his medical needs. Finally, he alleged that Defendant Mann violated Plaintiff's First and Fourteenth Amendment rights by keeping him confined in order to prevent him from communicating his beliefs to other inmates. Plaintiff also alleged state law claims analogous to his federal claims. He requested injunctive and declaratory relief, as well as damages.

Defendants have moved for summary judgment on all claims. Magistrate Judge Sharpe recommended granting the motion in part and denying it in part. Specifically, he recommended denying summary judgment as to the Equal Protection claim against Defendants Coughlin and Selsky and granting summary judgment on all other claims except the claim alleging a violation of due process because of inadequate procedures for periodic review of Plaintiff's administrative segregation.

No objections to the Report–Recommendation have been raised. Therefore, the Court may reject the conclusions of the Report–Recommendation only if they are clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory Committee Notes. Having reviewed the Report–Recommendation and the record, the Court adopts the Report–Recommendation except insofar as it recommends that the motion should be denied on the equal protection and inadequate review claims. This Court finds that summary judgment should be granted as to these claims, and the entire action dismissed.

### A. Equal Protection Claim

 Plaintiff alleges that Defendants Selsky and Coughlin violated Plaintiff's right to equal protection by treating inmates confined in administrative segregation differently than inmates confined for other non-punitive reasons, such as Protective Custody. Prison administrators, when making classifications, "need only demonstrate a rational basis for their distinc-

tions." *Jones v. North Carolina Prisoners' Union, Inc.,* 433 U.S. 119, 134, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). In *Choice v. Coughlin,* 1996 WL 325627 (June 11, 1996), the court found that the distinction did not violate the equal protection clause:

> The reason for plaintiff Choice's confinement in administrative segregation differs significantly from the justifications underlying the placement of inmates in involuntary protective custody. Inmates under involuntary protective custody are often victims or witnesses who require protection from others. By contrast, Choice was placed in the SHU under administrative—segregation status as the result of his own affirmative conduct, which necessitated that others be protected from him. Contrary to plaintiff's contention, inmates under involuntary protective custody are not "similarly situated." It is therefore impractical and irrelevant to compare the conditions of confinement of inmates in involuntary protective custody with those of inmates in administrative-segregation status. Plaintiff has thus alleged no cognizable violation of his equal protection rights.

*Id.* at *10. This Court agrees with this analysis and finds that the distinctions noted provide a rational basis for the greater restrictions placed on administrative segregation status. The Court therefore grants summary judgment on the equal protection claim.

### B. Inadequate Review Procedures

The due process right to a periodic review of administrative confinement stems from *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In that case, the Supreme Court stated that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Id.* at 477 n. 9, 103 S.Ct. 864. The Court found that "prison officials must engage in some sort of periodic review of the confinement of such inmates." *Id.* However,

This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner— which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner.

*Id.* Magistrate Judge Sharpe found that, under this standard, reviews must be " 'meaningful and not simply perfunctory.' " Report–Recommendation at 18 (quoting *McClary v. Kelly,* 4 F.Supp.2d 195, 213 (W.D.N.Y.1998) (citation omitted)). He found that although Plaintiff received periodic reviews in conformance with regulations, the regulations did not require any inmate input and that the record did not indicate what information, if any, was actually considered. The Magistrate concluded that a material question of fact existed as to whether the periodic reviews were "meaningful."

■ This Court has reviewed the record and finds that under the standard established in *Hewitt,* Plaintiff has raised no material question of fact as to the adequacy of the periodic reviews. In determining whether review was "meaningful," the limited nature of the due process right must be emphasized. Input from the inmate is not "necessarily require[d]" and the decision may be made based on facts which have been ascertained at the initial hearing combined with an "official's general knowledge of prison conditions and tensions." *Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. 864.

It must also be noted that it is Plaintiff who has the burden of proving a due process violation, not the Defendants who have the burden of disproving such an allegation. It is well-established that on a motion for summary judgment, the litigant opposing the motion "may not rest upon mere conclusory allegations or denials but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 100 (2d Cir.1997) (citation and internal quotations omitted).

■ Thus, Plaintiff must put forward some evidence indicating either that reviews were not made in a sufficiently timely fashion or that the substance of the review was insufficient to meet the minimal requirements of *Hewitt,* which as noted principally require that an officer review the original record and review that record in light of relevant knowledge available to the officer, if there is any. Here, Plaintiff has not put forward evidence indicating either of these circumstances.

First, Plaintiff has indicated no failure to make timely reviews as required by due process and state regulations. To the contrary, the record affirmatively supports the conclusion that the periodic reviews required by due process and state regulations were followed by defendants. *See* Clerkin Aff.Exh. I.

Second, Plaintiff has failed to indicate any evidence showing that the reviews were not sufficient under the requirements of *Hewitt.* The record shows that the reviews took the original record into account, and specifically found that there were no circumstances warranting a change in the conclusion that Plaintiff was a security threat. *See, e.g.,* Clerkin Aff. Exh. J (November 30, 1990 Review). The original record was clearly a sufficient basis for concluding that Plaintiff posed a threat to the security of the facility. Evidence included testimony of witnesses suggesting that Plaintiff played a role in encouraging a disruptive protest, a letter written by Plaintiff indicating that he was "at war" with the racist administration, Clerkin Aff.Exh. I, and testimony that inmates looked to him as a leader. *See, e.g.,* Clerkin Aff.Exh. I at 74 (testimony of employee that York was a "power in this particular institution and that the other inmates ... look to him for leadership.

That even though he wasn't the original catalyst that sparked the [protest], I felt that he definitely favored the lockdown and that his specific actions ... did a great deal to continue it.").

Nor does the record provides any evidence of circumstances or knowledge which the Defendants should have taken into account and didn't. To the contrary, the review reports repeatedly note that the Plaintiff's behavior in administrative segregation only confirmed the findings of the original hearing. For example, a report dated December 28, 1990 states that York "is continuing to experience a deteriorating adjustment as evidenced by comments from officers regulatory assigned to SHU regarding his disrespectful attitude [and thus, no] change in [his] status is recommended." *Id.* The Court finds that the periodic reviews in this case satisfied the requirements of due process.

Plaintiff alleges that the periodic review procedures were constitutionally inadequate because prisoners are not advised of the results of the review or informed of the reasons for the decision or of what they might do to satisfy officials that they do not pose a threat to the safety and security of others. Compl. ¶ 38–39. Although the Court does not adopt the view that the absence of these steps constitute a violation of due process, it is noted that one court has found the presence of such steps to play an important and perhaps critical role in determining whether the periodic review was meaningful. *See Giano v. Kelly*, 869 F.Supp. 143, 151 (W.D.N.Y.1994) (finding failure to provide meaningful review where the record did not reflect "careful consideration" of plaintiff's status and where defendants failed to inform defendant of the reasons for his continued segregation and what he could do to effectuate his release or to give him opportunity to present input).

■ Even if the due process requirement was not satisfied because of the absence of these procedures, summary judgment on the due process claim would still be warranted based on the reasoning of the Report–Recommendation, which this Court largely adopts. Magistrate Judge Sharpe found that although the periodic review claim was valid, the nature of the right to periodic review had not been clearly established in binding precedent and that the officers were therefore entitled to qualified immunity to the action insofar as it requested damages. Report–Recommendation at 19. The Magistrate also found that Plaintiff's claim was moot since he has been released from solitary and could not collect damages. However, the Magistrate also found that the action was subject to the mootness exception for cases which are "capable of repetition yet evading review," Report–Recommendation at 20, and thus recommended that the claim should survive to allow Plaintiff to pursue declaratory relief.[1]

■ This Court finds that the application of qualified immunity is not clearly erroneous. Qualified immunity bars an action for damages based on a constitutional right that is not "clearly established." *See Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993). In determining whether a right is clearly established, a court considers

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her rights were unlawful.

*Richardson*, 5 F.3d at 621. The Court finds that the language in *Hewitt*, which constituted dicta placed in a footnote, is not sufficiently specific to constitute a

---

1. Plaintiff was previously represented by Prisoners' Legal Services of New York. On September 14, 1998, Prisoners' Legal Services moved to withdraw as counsel. (Docket No. 41). This request was granted by Order of the District Court, signed by the Hon. Thomas J. McAvoy, Chief U.S. District Judge, Northern District of New York.

clearly established right, particularly if, as Plaintiff asserts, the right is understood to encompass the sorts of steps outlined in *Choice.* Further, there is no clarifying Supreme Court or Second Circuit law on the issue. Thus, the Magistrate's finding that qualified immunity applied to the periodic review claim was not clearly erroneous.

■ The Court also agrees that the doctrine of mootness is applicable to Plaintiff's claim. "When the parties lack a legally cognizable interest in the outcome of a case, it is moot and the federal courts lack jurisdiction." *Muhammad v. City of New York Department of Corrections,* 126 F.3d 119, 122 (2d Cir.1997) (citation and internal quotations omitted). Here, there is no cognizable interest in the outcome. Damages are not available due to qualified immunity, and because Plaintiff has been transferred from the facility, a request for injunctive relief directing that Plaintiff be released from the facility's SHU is clearly moot. *See Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir.1986).

■ Further, Plaintiff's request for declaratory relief is also moot. A request for declaratory relief, standing alone, becomes moot unless "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Golden v. Zwickler,* 394 U.S. 103, 106–08, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Plaintiff does not have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *See Beyah, id.* Thus, Plaintiff's action is moot at this time.

■ The Court disagrees with the Report–Recommendation only as to whether a mootness exception applies in this case. Specifically, the Court finds that the exception to mootness for cases which are "capable of repetition yet evading review" is not applicable. One requirement of this exception is that Plaintiff must show that "these *same parties* are reasonable likely to find themselves again in dispute over the issues raised" in the action. *Video Tutorial Services v. MCI Telecommunications,* 79 F.3d 3, 6 (2d Cir.1996) (citation and internal quotations omitted) (emphasis in original). "This requirement flows naturally from Article III, because we have 'no power to adjudicate a case that no longer presents an actual ongoing dispute *between the named parties.'" Id.* (citation omitted) (emphasis added).

■ Here, Magistrate Judge Sharpe recommended that the due process claim be dismissed as against Coughlin because he is no longer Commissioner of the Department of Correctional Services and has immunity to an action for damages. Report–Recommendation at 20–21. This is not clearly erroneous. However, Coughlin being dismissed, the only remaining defendants are employees of Shawangunk. Because Plaintiff has been transferred out of that facility, there is no reasonable likelihood that he will find himself in a dispute with these parties again. Therefore, the claim is not excepted from mootness and summary judgment is appropriate.

Accordingly, it is

ORDERED that the Report–Recommendation is APPROVED in part and REJECTED in part; and it is further

ORDERED that Defendants' motion for summary judgment is GRANTED and the action is therefore DISMISSED in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

### REPORT–RECOMMENDATION

SHARPE, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to

28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights action, plaintiff alleges that the defendants violated his First, Eighth and Fourteenth Amendment rights in connection with his placement in administrative custody for a period of twenty months.

Plaintiff seeks declaratory, injunctive, and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. (Docket No. 30). Plaintiff has responded in opposition to the defendants' motion. (Docket Nos. 36–37). For the following reasons, the court agrees with plaintiff and will recommend denying defendants' motion in part and granting the motion in part.

## DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In the instant case, plaintiff challenges his administrative confinement in the Special Housing Unit (SHU) at Shawangunk Correctional Facility. Plaintiff was originally confined to SHU from October 27, 1988, until October 26, 1989, as punishment for a disciplinary infraction. Plaintiff had been found guilty of playing a leadership role in an incident on B–2 Block where plaintiff was housed. The Superintendent's Hearing Disposition for the 1988 incident indicates that plaintiff encouraged other inmates to either disobey or delay in obeying orders. (Defendants' Exhibit B). The Disposition further indicates that "upon a hand signal ... from [plaintiff] the inmates then complied." *Id.* One of the reasons for the penalty imposed was that the plaintiff's actions "resulted in a coordinated response from the other inmates." *Id.* This behavior was viewed as a threat to the order of the facility.

On October 3, 1989, near the end of the plaintiff's disciplinary sentence, prison officials wrote that he was relating well to facility rules at the time, notwithstanding two misbehavior reports that he had received during his stay in SHU. (Defendants' Exhibit E). Plaintiff was due to be released from his disciplinary confinement on October 26, 1989. On October 11, 1989, a request was made to transfer the plaintiff to another facility so that he would not be released into the general population at Shawangunk, however, this request was denied by the Inspector General's Office on October 25, 1989, and affirmed by Executive Review on November 13, 1989. (Defendants' Exhibit E at p. 2).

Plaintiff was not released from SHU on October 26, 1989, instead he was maintained in confinement and served with an "administrative segregation recommendation," signed by the Superintendent. (Defendants' Exhibit H at p. 6). The reasons stated in the recommendation for plaintiff's administrative segregation placement were: (1) his "pattern of obstructive behavior" while at the facility, specifically, the influence that plaintiff had upon other inmates in 1988, which caused the dissolution of the Inmate Liaison Committee; (2)

his involvement in the disruptive protest conducted by the inmates in the B–2 Housing Unit; (3) his "declaration of war on the (racist) administration" as stated in a letter dated February 8, 1989; and, (4) other inmates' reference to plaintiff as the "Field Marshall (sic)." *Id.* The recommendation further stated that based on the above reasoning, plaintiff's presence in general population would pose "a threat to the safety and security of [the] facility." *Id.*

Plaintiff was afforded a hearing on the administrative segregation recommendation conducted by defendant Patterson. (Defendants' Exhibit I [transcript of hearing] ). Several witnesses testified at the hearing. Superintendent Mann testified regarding his determination that plaintiff was a security threat. Plaintiff had several witnesses testify on his behalf. However, after the hearing, it was determined that plaintiff would remain in SHU, confined to administrative segregation. Plaintiff's counsel [2] filed three letters with defendant Selsky, appealing from the administrative segregation decision. (Plaintiff's Exhibits 6–8). The appeals were denied. Letters were also written to defendant Commissioner Coughlin on plaintiff's behalf by various individuals in the community, including state legislators.

At Commissioner Coughlin's deposition, he testified that he read the letters from the legislators and directed that responses be prepared for his signature. (Defendants' Exhibit L at pp. 20–21). Plaintiff was kept in administrative segregation rather than transferred to another facility. The defendants have submitted plaintiff's administrative segregation reviews which recommended plaintiff's retention in administrative segregation. (Defendants' Exhibit L). Plaintiff was not released from administrative segregation until June of 1991 when First Deputy Commissioner Glen Goord transferred plaintiff to Clinton

Correctional Facility. (Defendant's Exhibit K).

### 3. *Respondeat Superior*

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

■ Defendants allege that former Commissioner Coughlin was not personally involved in the plaintiff's case. During the former Commissioner's deposition, he admitted that the plaintiff's situation was brought to his attention through letters from the community, and that he read the letters from legislators. (Defendants' Exhibit L at p. 20). Defendant Coughlin

---

**2.** Prisoner's Legal Services wrote these letters on plaintiff's behalf. Plaintiff was not represented at the administrative segregation hearing.

stated that he directed subordinates to investigate and formulate responses to those letters. *Id.* at pp. 20–21. Former Commissioner Coughlin stated that although he had the authority to release an inmate from administrative segregation, he would rely upon his subordinates' assessment of the situation, and affirm the placement if both Philip Coombe and Glen Goord, Deputy for Operations agreed that the administrative segregation status should be maintained. *Id.* at 31. Only if Coombe and Goord did not agree, did Coughlin "break the tie." *Id.* It is clear, however, that defendant Coughlin was personally involved in plaintiff's administrative segregation status, even though he did not personally investigate the issue.

Based upon the record, it is arguable that defendant Coughlin had sufficient personal involvement to survive summary judgment on this basis.

### 4. *Due Process*

Plaintiff alleges that he was denied due process as a result of his confinement to administrative segregation for twenty months. Plaintiff has three separate due process claims. Plaintiff alleges that his indefinite confinement to SHU was improperly based upon the same allegations for which he had already served a one year disciplinary sentence. Plaintiff also alleges that defendants Patterson and Selsky improperly accepted Superintendent Mann's recommendation for administrative segregation without sufficient evidence to support it. Finally, plaintiff alleges that defendants Mann, Selsky, and Coughlin violated plaintiff's due process rights by failing to establish any meaningful review procedures for the administrative placement.

The cornerstone of a due process analysis is a determination of whether a liberty or property interest exists, sufficient to require procedural protections prior to its deprivation. *Logan v. Zimmerman Brush, Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). If the interest exists,

the court must determine the extent of the procedural protections and whether they were followed in the particular case. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Inmates' liberty interests are derived from two sources, the Fourteenth Amendment itself, and state statutes or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998). The Due Process Clause of the Fourteenth Amendment protects only "the most basic liberty interests in prisoners." *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Until 1995, the standard used for determining whether a state had created a protected liberty interest was found in *Hewitt.* There, the court held that a state may create a liberty interest through a statute or regulation that utilizes language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* at 471, 103 S.Ct. 864.

After *Hewitt,* lower courts and appellate courts focused more upon the statutory language, rather than upon the character of the deprivation involved. *See e.g., Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.) (finding no liberty interest after examining regulations associated with the family reunion program), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding a liberty interest in remaining free from involuntary protective custody); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on the language of the regulations); *Hall v. Unknown Named Agents of N.Y. State Dep't for Correctional Services,* 825 F.2d 642 (2d Cir.1987) (no liberty interest in transfer to APPU from protective custody based upon an analysis of the regulations). The Second Circuit had specifically held that the state regulations created a liberty interest in remaining free from administrative segregation.

*Wright v. Smith,* 21 F.3d 496, 499 (2d Cir.1994) (citing *Matiyn,* 841 F.2d 31).

■ In *Sandin v. Conner,* the Supreme Court held that the *Hewitt* analysis is no longer applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 482–83, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). After *Sandin,* courts may not rely solely upon the language of the regulations when determining whether a liberty interest exists. *Id.* The court stated that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* at 483, 115 S.Ct. 2293. The court also stated that it was *returning* to the principles established in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Thus, a plaintiff must now establish both that the confinement creates an atypical and significant hardship *and* that the state has, by regulation or statute, granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *McClary v. Kelly,* 4 F.Supp.2d 195, 197–98 (W.D.N.Y.1998) (*citing Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996)).

Although *Sandin* dealt with punitive confinement, the Second Circuit has held that its analysis is applicable to both punitive as well as administrative segregation. *Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998). In making the determination of what constitutes an "atypical and significant" hardship, courts must focus on the degree and duration of the inmate's restraint. *Id.* at 335. The Second Circuit has stated that a determination of the "degree" of restraint involves a comparison of the conditions of general population and other categories of segregation. *Id.* at 336 (citing *inter alia Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997)). This determination will require fact-finding. *Brooks,* 112 F.3d at 48–49. The court must then articulate the factual predicates for its determination of whether the conditions of the plaintiff's segregation implicate a liberty interest. *Arce,* 139 F.3d at 336.

It has already been held that New York has promulgated "detailed and substantive regulations" concerning an inmate's right to due process when being placed in SHU for administrative purposes. *See, McClary,* 4 F.Supp.2d at 211–12. Prior to *Sandin,* the Second Circuit held that these regulations were sufficiently mandatory to create a liberty interest in remaining free from administrative confinement. *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir.1989); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990). Thus, the plaintiff in the instant case has met the first prong of the *Sandin* analysis. The court must then determine whether the confinement to which plaintiff was subjected was atypical and significant in relation to the ordinary incidents of prison life.

The court in *McClary* dealt with the same issue that is before this court. 4 F.Supp.2d at 202–11. *McClary* noted three factors, following *Sandin,* that courts should evaluate in making this determination. *Id.* at 202–03. The court must examine the effect of the segregation on the length of prison confinement, the extent to which the conditions of the segregation differ from other routine prison conditions, and the duration of the segregation imposed. *Id.* (*citing Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). In the instant case, there is no claim that the segregation affected the length of plaintiff's prison confinement. The only issues that

need to be considered are the duration of the segregation and whether the conditions to which plaintiff was subjected differed significantly from "routine" prison conditions.

The court in *McClary* held a hearing on the above issues in order to compare and make factual findings regarding the difference between the conditions in administrative segregation and general population. 4 F.Supp.2d at 202. Plaintiff in the instant case was kept in SHU in "administrative" confinement for twenty months after he had already spent one year in punitive confinement for rule violations. Plaintiff has submitted statistics for disciplinary confinement, showing that less than one percent of the inmate population is ever subjected to confinement for more than one year. (Plaintiff's Exhibits 1 and 2). The Department of Correctional Services apparently did not keep records regarding those inmates that were in SHU for administrative as distinguished from disciplinary purposes. *McClary*, 4 F.Supp.2d at 210. However, if only one percent of the population was confined to SHU for longer than one year, and that one percent includes both disciplinary and administrative admissions, then less than one percent of the inmates were placed in administrative segregation for more than one year.

The court in *McClary* noted that SHU involves 23 hour per day confinement to one's cell, exercise restricted to a small exercise cell, no recreational equipment, no physical contact with other inmates, and restricted access to the commissary, law library and shower facilities. 4 F.Supp.2d at 204. SHU inmates were also restricted in their visitation and telephone privileges, *Id.* at 204–05. Plaintiff in the instant case has outlined very similar restrictions that were placed on him during his stay in the SHU for administrative reasons. Plaintiff's Local Rule 7.1 Statement of Undisputed Facts at (D)(13)–(D)(34).

Plaintiff's exercise was restricted to one hour of outdoor recreation, taking place in one of three small enclosed yards, while general population inmates had a choice of several large yards with sports equipment. *Id.* at (D)(20). Pictures of the cells and the exercise areas have been included as Plaintiff's Exhibits 10 and 11. Plaintiff also states that general population inmates had a wide variety of educational and rehabilitative programs in addition to different kinds of jobs, paying some form of wages. *Id.* at (D)(21). Inmates in administrative custody are afforded some minor increase in privileges from disciplinary inmates, such as the ability to possess some personal items, cigarettes and the ability to make some commissary purchases. *Id.* at (D)(26). Plaintiff states that an inmate in administrative segregation is entitled to the same pay as an inmate on "idle" status, while a disciplinary inmate received no pay. *Id.*

Plaintiff states that administrative segregation inmates are subject to the same rules as inmates in disciplinary segregation who have completed thirty days of "adjustment." *Id.* at (D)(36). Protective custody inmates, however, enjoy more privileges than either administrative or disciplinary inmates. *Id.* at (D)(27)–(34). Finally, plaintiff alleges that extended periods of incarceration under the restrictive conditions found in SHU have a deleterious effect on the inmate's mental state. Plaintiff has submitted the affidavit of Dr. Stuart Grassian, a Board Certified Psychiatrist. (Plaintiff's Exhibit 13). Dr. Grassian also testified in *McClary*. 4 F.Supp.2d at 205–07.

Dr. Grassian's opinion is that solitary confinement can cause severe psychiatric harm. (Grassian Affidavit at (II)(11)). He opines that there is a syndrome associated with agitation, self-destructive behavior, and overt psychotic disorganization. *Id.* at (II)(12). The doctor stated that even among inmates that do not develop overt psychiatric illness, solitary confinement imposes "significant psychological pain" and often impairs the inmates' later behavior upon his return to the general popula-

tion environment. *Id.* at (II)(13). Plaintiff also submitted an affidavit, attesting to the adverse effects of the SHU confinement. (Plaintiff's Exhibit 12).

While the above deprivations for a limited period of time are not atypical and significant, as the length of time increases that one is confined under those restrictions, the deprivation begins to become atypical and significant with respect to the ordinary incidents of prison life in general population. *McClary,* 4 F.Supp.2d at 211. In *McClary,* plaintiff had been in administrative confinement for more than four years. Although plaintiff in the instant case was in administrative confinement for twenty months, the undersigned finds that he has shown an atypical and significant deprivation, giving rise to a liberty interest in remaining free from administrative confinement of that length.[3]

The fact that a liberty interest exists, however, does not end the court's inquiry. The court must now determine the extent of the due process protection and whether plaintiff was afforded all the process that he was due. Prior to *Sandin,* the Supreme Court had held that the process due for administrative placement was "an informal, nonadversary review," within a "reasonable time following the inmate's transfer." *Hewitt,* 459 U.S. at 476, 103 S.Ct. 864. All that was required was that the inmate receive some notice of the charges against him and an opportunity to present his views to the prison official charged with the decision to transfer the inmate to administrative segregation. *Id.* at 460, 103 S.Ct. 864. Additionally, the officials must engage in a "periodic review" of the inmate's case to determine whether he remains a security risk. *Id.* at 477 n. 9, 103 S.Ct. 864. The Supreme Court also cautioned that administrative segregation was not to be used as a reason for "indefinite" confinement of an inmate. *Id.* The

Second Circuit had held that a full hearing would be required if the inmate were to be administratively confined for an extended period of time. *See, Wright v. Smith,* 21 F.3d 496, 499–500 (2d Cir.1994).

The court in *McClary* held that because administrative segregation may not be used as a pretext for indefinite confinement of the inmate, the decision in favor of administrative confinement must be supported by "some evidence." 4 F.Supp.2d at 212–13. The *McClary* court utilized the sufficiency of evidence standard articulated in *Superintendent v. Hill,* 472 U.S. 445, 447, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). *Hill* was a case in which the inmate could have lost good time credits as a result of a disciplinary finding. Additionally, the court in *McClary* followed the court's decision in *Giano v. Kelly,* 869 F.Supp. 143, 150–51 (W.D.N.Y.1994), holding that due process is not satisfied if the periodic reviews required by the regulations are not meaningful reviews and are simply perfunctory affirmance of the administrative placement.

Defendants in the instant case argue that even if the court were to find a protected liberty interest, the plaintiff received due process. Plaintiff was afforded a full hearing on the administrative segregation placement. Plaintiff argues, however, that the hearing decision was based upon information that had already been used to justify his disciplinary confinement of one year. Plaintiff also alleges that the hearing officer at his administrative segregation hearing used other information that was quite old and for which the plaintiff had not been disciplined at the time the events occurred. Finally, plaintiff claims that the periodic review of his administrative placement was not meaningful.

██ A review of the record shows that plaintiff received a substantial hearing on the issue of his administrative segregation.

---

**3.** The Second Circuit has held that the existence of a liberty interest must be determined based upon the actual period of the inmate's confinement, rather than the potential time

that the inmate could have been confined under the restrictions imposed. *Scott v. Albury,* 138 F.3d 474 (2d Cir.1998).

Various witnesses testified for and against the plaintiff. The transcript of the hearing has been submitted as Defendants' Exhibit I. A request to transfer the plaintiff was denied on October 25, 1989. (Defendants' Exhibit E). Plaintiff first argues that the same information was used to maintain plaintiff in administrative segregation as was used to sentence plaintiff to disciplinary segregation. Plaintiff's allegation is true. The defendants used the fact that plaintiff exerted influence over other inmates during the B–2 incident to argue that plaintiff should be maintained in administrative segregation for security purposes.

There is, however, no constitutional prohibition against the defendants' actions in this regard. The defendants were not finding plaintiff guilty a second time for the B–2 incident, rather, the defendants found that because of the type of influence the plaintiff exerted on other inmates, exemplified by the B–2 incident, his presence in general population would pose a security problem. Additionally, the defendants relied upon the letter written by plaintiff, stating that he was "at war" with the racist administration. The defendants used the plaintiff's alleged involvement in the resignation of the inmate liaison committee to determine that his presence in general population would pose a security problem. The defendants also relied upon confidential information in their determination. The confidential report has been submitted to the court for its *in camera* review.

While it is true, as plaintiff alleges, that the incidents relied upon by the defendants were not current, there is no prohibition in prison administrative proceedings against the defendants using old information. Even prior to *Sandin*, the amount of evidence necessary for an administrative segregation determination was minimal. *Hewitt*, 459 U.S. at 472–77, 103 S.Ct. 864. The defendants are given great latitude when questions of facility security are at issue. *Id.* at 474, 103 S.Ct. 864.

Plaintiff does not deny that he wrote the letter in question nor does he deny that there might be an inmate or inmates that refer to the plaintiff as Field Marshall (sic), however, plaintiff contends that this information was known to the defendants prior to his disciplinary placement in SHU. Plaintiff's witnesses during the hearing stated that plaintiff was a "positive" influence on other inmates. However, Deputy Superintendent Miller testified that he spoke to inmates on the liaison committee who stated that they were pressured into resigning by plaintiff. (Defendants' Exhibit I, Transcript of Administrative Segregation Hearing (T) at 72). Miller also testified that although York was not the initial catalyst for the B–2 protest, he was doing a great deal to continue it. *Id.* at 74. Miller stated that the negotiators would have settled the situation sooner, but they were trying to contact plaintiff in SHU before they would commit to a solution. *Id.*

Miller also testified that the plaintiff's presence "generates a feeling of discord." *Id.* at 79. Miller did admit that plaintiff has the emotional strength to bring individuals to his way of thinking and that this is both a positive and a negative influence. *Id.* Miller also stated that he was making his determination based not only on informants, but upon his own relationship with the plaintiff during his tenure on the Inmate Liaison Committee. Miller stated that the plaintiff exerted this influence whether he intended to or not. *Id.* at 81.

Corrections Officer Kelly testified that plaintiff could be a security threat in general population without even knowing it because of plaintiff's "notoriety." *Id.* at 94. At the same time, Kelly stated that plaintiff "had a good side," but that he could still influence others. *Id.* at 95. Based upon the testimony at the hearing, the court must find that the administrative segregation determination was supported by at least "some" or a "modicum" of evidence, sufficient to pass constitutional muster. The evidence, coupled with the

denial of plaintiff's transfer, was sufficient to retain the plaintiff in his restrictive status. Whether the court agrees with that determination is not relevant to the decision of whether a constitutional violation has occurred.

The court would point out that there is an issue of review of confidential information. During the hearing, Miller stated that he thought the confidential informant's "word was good." (Defendants' Exhibit I [T. at 78]). Superintendent Mann testified that he felt that the informant would be in a position to know, but he had not dealt with the informant before. *Id.* at 13. He further stated that he "had reason to believe" that the informant was telling the truth, but there was no explanation in the transcript for Mann's statement. *Id.*

Miller, however, testified that his opinion was not based solely upon the confidential information, but was based upon his personal relationship with plaintiff during plaintiff's tenure on the Liaison Committee, problems that plaintiff had experienced, and influence that he exerted, whether he intended to or not. *Id.* at 81. Additionally, there is no question that the plaintiff did write the letter referred to above. The plaintiff argues that it should not be interpreted to infer that he is a security threat. The defendants, however, interpret the tenor of the letter differently than does the plaintiff. It is not the court's prerogative to second guess prison officials' interpretations of security issues, whether the court agrees with the interpretation or not. *See, Arce v. Miles,* 85–CV–5810, 1991 WL 123952 at \*7 (S.D.N.Y. June 28, 1991) (citing *Hewitt,* 459 U.S. at 474, 103 S.Ct. 864). Thus, even without the confidential information, the defendants had sufficient information to place plaintiff in administrative confinement.

▮ Finally, the court would note that although "some" assessment of the credibility of confidential information is required, exactly what method or procedure is constitutionally required, has not been decided by the Second Circuit. *See, Campo v. Keane,* 913 F.Supp. 814, 824 (S.D.N.Y.1996) (citing *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). The doctrine of qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Second Circuit has also stated that qualified immunity will be available to a defendant even though the official's actions were clearly delineated at the time of his or her actions, but it was "objectively reasonable" for the defendant to believe that those actions did not violate the plaintiff's rights. *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987).

In the instant case, the hearing officer did not independently evaluate the credibility of the confidential information. However, the hearing officer asked both Superintendent Mann and Deputy Superintendent Miller what they thought of the credibility of the informant(s). Both witnesses stated that they believed the informant(s) to be truthful and reliable, even though the informant(s) had never given "reliable information in the past."

The hearing in the instant case took place in October of 1989. In 1993, the Second Circuit held that the extent of the examination of the credibility of confidential information was not well established in 1989, and was still not well established in 1993, thus, the defendants in the instant case would be protected by qualified immunity for any constitutional violation resulting from the lack of independent evaluation of the confidential information.

Plaintiff in the instant case also alleges that the periodic reviews of his administrative segregation were insufficient. In *McClary v. Kelly,* the court denied defendants' motion for summary judgment with respect to the adequacy of periodic reviews of administrative segregation placement.

4 F.Supp.2d at 212–13. The court in *McClary* cited *Giano v. Kelly*, 869 F.Supp. 143, 150–51 (W.D.N.Y.1994) in holding that "[d]ue process is not satisfied where the periodic reviews are a sham; the reviews must be meaningful and not simply perfunctory." *McClary*, 4 F.Supp.2d at 213 (citing *inter alia Giano, supra.*).

In the instant case, Defendants' Exhibit J contains the results of the periodic review of plaintiff's administrative segregation status. The documents only contain language indicating that a periodic review was performed in accordance with Department of Correctional Services' Directives and facility policy. (Defendants' Exhibit J). In fact, some documents contain, not only plaintiff's review, but the reviews of other inmates. *Id.* The documents simply indicate that no change in status is recommended. There is no indication of any information considered.

The regulations provide only that an inmate assigned to administrative segregation will have his status reviewed every seven days for the first two months, and every thirty days thereafter. N.Y.COMP. CODES R. & REGS. tit. 7, § 301.4(d). The reviews are completed by a three-member panel consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. *Id.* The regulations also provide that the results of the review will be forwarded, in writing, to the superintendent for final determination. *Id.* There is no provision in the regulation for inmate input or inmate notification of results. There is no way of determining from the documents contained in the defendants' papers whether the reviews were adequate, although it does appear that the reviews complied with the regulations.

Although the *McClary* court denied summary judgment based on the question of fact regarding the adequacy of the periodic reviews, the Southern District in *Choice v. Coughlin*, 1996 WL 325627 at *8–9 (S.D.N.Y. June 11, 1996) granted summary judgment to defendants based

upon the doctrine of qualified immunity with respect to the adequacy of periodic reviews in administrative segregation cases. The court held that "[w]hat is meant by meaningful review in the context of post-administrative segregation hearing reviews ... is not clear." The court stated that during the period of the plaintiff Choice's confinement in 1992–1993, there was no case law in the Second Circuit or the Supreme Court specifically addressing the due process rights inherent in the periodic review of an inmate's status in administrative segregation. *Id.* at *9 (citing *Giano*, 869 F.Supp. at 151).

Plaintiff in the instant case was confined in administrative segregation even prior to the plaintiff in *Choice*. The court in *McClary* never discussed qualified immunity with respect to the adequacy of periodic reviews. The undersigned, however, must agree with the court in *Choice*. The definition of "meaningful review" of administrative segregation status was not clear during the time of this plaintiff's confinement, thus, the right that plaintiff claims was not clearly established during that time, and the defendants could not have known that they were violating plaintiff's constitutional rights, and any claim for damages may be dismissed.

The court notes that plaintiff has also asked for declaratory relief. The decision whether to grant declaratory relief rests in the sound discretion of the District Court. *Christopher P. v. Marcus*, 915 F.2d 794, 802 (2d Cir.1990), *cert. denied*, 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991). A litigant may not use the declaratory judgment statute to obtain judicial relief for moot questions. *Id.* In determining whether an issue is moot, the relevant question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties that have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Id.* (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61

S.Ct. 510, 85 L.Ed. 826 (1941) (citations omitted)).

However, when the defendants' alleged conduct is capable of repetition yet evading review, mootness does not strip the court of jurisdiction. *Id.* (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). This requires that the same complaining party would be subject to the same action again. *Id.* (citing *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)). The test requires that there be a "reasonable expectation" or a "demonstrated probability" that the same controversy will recur. *Id.* at 803 (citing *Honig v. Doe*, 484 U.S. 305, 318–19, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)).

Plaintiff in the instant case was released from administrative segregation in 1991, when he was transferred to another facility, however, the possibility of plaintiff being confined for administrative reasons again is not remote. Thus, the court finds that it is reasonable to believe that the plaintiff may again be subjected to administrative segregation, and the court finds that declaratory relief is not moot even if damages are precluded by qualified immunity.

The court does note, however, that defendant Coughlin is no longer the Commissioner of the Department of Correctional Services. Damages would have been the only relief available to plaintiff against defendant Coughlin since he no longer has the authority to perform any actions for the Department of Correctional Services. Since damages are precluded by qualified immunity in this case, the action may be dismissed as against defendant Coughlin in its entirety for any due process claims.

### 5. *Cruel and Unusual Punishment*

Plaintiff also alleges in his complaint that defendants Mann, Selsky, and Coughlin were deliberately indifferent to plaintiff's serious medical needs when they kept him in SHU despite the harm to plaintiff's health. The court notes that this claim was not addressed by either party in the summary judgment motion, however, there is no evidence that any of the defendants were aware of plaintiff's medical condition or that plaintiff complained of a medical or mental problem while confined to SHU for administrative reasons. In order to be liable for an eighth amendment violation, the defendants must act with deliberate indifference to plaintiff's serious medical needs. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). For prison officials, deliberate indifference requires more than negligence, but less than conduct taken for the specific purpose of causing harm. *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The standard for deliberate indifference requires that the official know of and disregard an excessive risk to inmate health or safety. *Id.* at 837, 114 S.Ct. 1970.

In the instant case, although plaintiff alleges in the complaint that he believes that his hypertension became worse due to his administrative segregation, there is no claim or evidence that any of the defendants were aware of his medical condition or that he was not treated for any condition he may have had. Thus, the undersigned must recommend dismissing any eighth amendment claim relating to plaintiff's medical care or condition as to all defendants.

### 6. *First Amendment*

Plaintiff also alleges that the defendants Selsky and Coughlin violated plaintiff's first amendment rights by limiting the plaintiff's visits, however, there is no allegation that the plaintiff's visits were limited in any way that was not related to the limitations existing, due to his administrative segregation status. Plaintiff also does not specify that he requested and was denied any particular visit. Thus, any first amendment claims regarding limitations

on visitation may be dismissed as to all defendants.

■ The plaintiff has also alleged that the defendants violated his first amendment rights by confining him in administrative segregation due to his religious and political beliefs. There is no evidence that there was any religious motivation in the defendants' actions. Additionally, the fact that plaintiff stated in his complaint that he is a former Black Panther, does not make the defendants' actions "politically" motivated. In any event, since the undersigned has found that there was sufficient evidence to place the plaintiff in administrative segregation for security reasons, the fact that the defendants may or may not have had other unconstitutional motivations, is not actionable under Section 1983. *See, Lowrance v. Achtyl,* 20 F.3d 529, 532 (2d Cir.1994) (actions taken for both proper and improper reasons may be sustained if the action would have been taken in the absence of the improper reason); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984) (same).

### 7. *Equal Protection*

Finally, plaintiff's complaint contains a claim alleging that plaintiff's equal protection rights were violated when defendants placed more restrictions on administrative segregation inmates than on other inmates confined to SHU for nonpunitive reasons such as involuntary protective custody. This issue was not addressed by the defendants' summary judgment motion and cannot be resolved based upon the resolution of the other issues in this case or based on the complaint alone. Thus, this claim may survive.

**WHEREFORE,** based on the findings in the above report, it is

**RECOMMENDED,** that defendants' motion for summary judgment is **GRANTED** as to the **EIGHTH AMENDMENT and FIRST AMENDMENT CLAIMS,** and the complaint be dismissed in its entirety as to these claims, and it is

**RECOMMENDED,** that defendants' motion for summary judgment is **GRANTED,** as to defendant Coughlin as to all claims except the Equal Protection claim, and it is

**RECOMMENDED,** that defendants' motion for summary judgment is **GRANTED** with respect to all due process claims except the improper periodic review claim, and it is

**RECOMMENDED,** that the defendants' motion for summary judgment is **GRANTED,** with respect to any claim for damages with respect to all due process claims, and it is

**RECOMMENDED,** that the defendants' motion for summary judgment is **DENIED,** with respect to plaintiff's claim for declaratory relief with respect to the improper periodic review claim only.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 6(a), 6(e), 72.

October 28, 1998.